# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| | ) | |
| v. | ) | ID. No. 2203010974 |
| | ) | |
| | ) | |
| BRANDON NORMAN, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: July 18, 2025
Decided: October 28, 2025

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF SHOULD BE SUMMARILY DISMISSED

Domenic Carrera, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Olivia Phillips, Esquire, defense counsel.

Brandon Norman, Howard R. Young Correctional Institution, P.O. Box 9561, Wilmington, DE 19809, *pro se*.

**O'CONNOR,** Commissioner.

This 28th day of October, 2025, upon consideration of Defendant Brandon Norman's Motion for Postconviction Relief,[1] the Affidavit of defense counsel,[2] Defendant's Reply to Counsel's Affidavit,[3] and the Record in this matter, the following is my Report and Recommendation.

## I.    PROCEDURAL BACKGROUND

On March 20, 2022, Brandon Norman ("Defendant") was arrested by the Delaware State Police ("DSP") for charges including Assault Second Degree, Possession of a Deadly Weapon During the Commission of a Felony, Terroristic Threatening, Endangering the Welfare of a Child, Criminal Mischief, and numerous motor vehicle violations.[4]   On September 25, 2022, a New Castle County Grand Jury indicted Defendant for Assault Second Degree, Possession of a Deadly Weapon During the Commission of a Felony, three counts of Endangering the Welfare of a Child, four counts of Terroristic Threatening, Criminal Mischief, Leaving the Scene of a Collision Resulting in Property Damage, Failure to Drive in a Lane of Traffic, Driving while License is Suspended or Revoked, Operating an Unregistered Motor Vehicle, and Fictitious Registration.[5]

---

[1]  Docket Item ("D.I.") 44.
[2]  D.I. 53.
[3]  D.I. 57.
[4]  D.I. 1.
[5]  D.I. 9.

On September 7, 2023, Defendant filed a Motion for Substitution of Counsel, specifically seeking to represent himself at trial. This Court granted Defendant's Motion, and appointed Olivia Phillips, Esquire as standby counsel.[6]

On September 12-13, 2023, this Court presided over a two-day jury trial.[7] After deliberating, the jury found Defendant guilty of all indicted offenses except for three counts of Terroristic Threatening.[8] Defendant's bail was revoked, and sentencing was deferred.

On December 15, 2023, this Court imposed an aggregate sentence of thirty-two years Level V, suspended upon serving five years Level V, followed by decreasing levels of probation supervision.[9] The Defendant appealed his conviction, and on September 12, 2024, the Delaware Supreme Court affirmed the judgment of this Court, denying Defendant's direct appeal.[10]

On July 22, 2024, Defendant filed a *pro se* Motion for Postconviction Relief ("Motion").[11] In the Motion, Defendant raised three general claims, some with sub-claims. In the first claim, Defendant argued the prosecutor "suppressed evidence of

---

[6] D.I. 27. Ms. Phillips was Defendant's trial counsel of record prior to his election to waive his right to appointed counsel and proceed *pro se*, and when Defendant was permitted to represent himself, he requested this Court appoint Ms. Phillips as standby counsel. Ms. Phillips will be referred to as "defense counsel" in this Report and Recommendation.

[7] D.I. 32.

[8] *Id.*; D.I. 33.

[9] D.I. 35.

[10] *Norman v. State*, 2024 WL 4165103 (Del. Sept. 12, 2024).

[11] D.I. 44.

blood and physical injuries inflicted to [him] by not including the alleged weapon in discovery."[12] Defendant also argued defense counsel led him "to believe the weapon would automatically be included as evidence at trial."[13] He further suggests defense counsel was somehow ineffective for that incorrect representation, as well as for being present when "initial victim statements made to [the] police were removed from evidence which highlighted gross deviations in the victim's initial account of events and his testimony at trial."[14]

In Defendant's second claim, he contends that prior to trial, defense counsel denied him "the right to subpoena expert collision and medical experts to consult the physical evidence and professionally opine how [the] vehicular collision occurred, as well as the effects such a sudden infliction affected [his] actions and state of mind to constitute the charges."[15] Defendant suggests this inability to subpoena experts inhibited him "from setting forth a more accurate set of facts from what the prosecution offered at trial."[16]

Finally, in the third claim, Defendant argues he was "uninformed" when he waived his right to counsel. He argues he waived his right to counsel because his "attorney was not acting on behalf of [his] best interests." Defendant claims he did

---

[12] *Id.*, p. 3.
[13] *Id.*, p. 3-4.
[14] *Id.*, p. 4. Defendant failed to identify or explain the "gross deviations" in the victim's statement(s).
[15] *Id.*, p. 3-4.
[16] *Id.*

4

not know he could have "simply asked the court for a different public defender or asked the Court to retain a private attorney on [his] behalf."[17] And, if he knew he could have requested another attorney, the newly appointed attorney would have allowed him to subpoena the aforementioned medical and collision experts, who would have then opined on "the physical evidence surrounding a collision and on the causation of damage as well as the effects such a sudden encounter had on [his] actions and state of mind."[18]

## II.   FACTUAL BACKGROUND

The Supreme Court, in its opinion affirming Defendant's direct appeal, found the following record facts:

> The charges arose from an incident that began with an automobile collision on March 20, 2022. Dennis Zink was driving his pickup truck on Springfield Boulevard; Zink's three young children were in the back seat. As Zink approached a curve in the road, he observed an oncoming BMW, driven by Norman, driving dangerously. Zink pulled to the side of the road, but the BMW crossed the road, struck Zink's truck, and continued into a wooded ditch on Zink's side of the road.
>
> After the crash, Norman exited his vehicle and approached Zink's truck, carrying a "Club"-style steering-wheel locking device. Norman used the steering-wheel lock to bash in the window of Zink's truck. He then reached through the broken window, opened the locked door, and began beating Zink with the steering-wheel lock, as Zink's children screamed in the back seat; he also threatened to murder Zink. Zink sustained a broken nose and injuries to his arm that interfered with his ability to work and perform daily activities for several months.

---

[17] *Id.*
[18] *Id.*, p. 4.

The crash and ensuing commotion drew the attention of several residents of nearby homes, one of whom recognized Norman because they had played football together for several seasons. The acquaintance intervened and Norman left the scene with him; they walked through the yard of one of the nearby properties and got into the acquaintance's car. The acquaintance began driving toward Norman's house, but after a short time Norman asked to get out of the car near Governor Square Shopping Center. The acquaintance then returned to the scene and identified Norman to responding law-enforcement officers.

In the meantime, one of the responding officers, Delaware State Trooper Sherwood, had determined that the license plate displayed on the BMW was expired and registered to a Chevy Malibu that belonged to Norman and that the BMW's vehicle-identification number was unregistered. Trooper Sherwood obtained a DMV photo of Norman and bystanders' descriptions of the suspect's appearance and clothing and learned that Norman and another person had left the neighborhood in a black Chrysler 300. Trooper Sherwood conveyed the identifying information to other officers, who soon apprehended Norman near Governor Square Shopping Center.

Norman testified at trial. He admitted veering into oncoming traffic but stated that he tried to avoid a collision by steering onto the shoulder on Zink's side of the road. He testified that Zink slowed his truck to approximately two miles an hour but then intentionally turned the truck to strike Norman's vehicle, pushing Norman's vehicle into the ditch. Norman testified that he approached Zink's truck carrying the steering-wheel lock and asked why Zink had hit his vehicle, to which Zink responded by laughing and raising his window. Norman then became emotional, put a hole in the window with the steering-wheel lock, attempted to remove Zink from the truck, and, while Zink remained seated in the truck, leaned over the seat and began striking Zink with the steeling-wheel lock. Norman admitted threatening to murder Zink but denied threatening to murder the children.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

In order to prevail on an ineffective assistance of counsel claim, a defendant must show: (1) "that counsel's representation fell below an objective standard of

6

reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[19] There is a strong presumption that counsel's legal representation was competent and falls within the "wide range" of reasonable professional assistance.[20] "The standard for judging counsel's representation is a most deferential one."[21] Trial counsel "observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge."[22] The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.[23] As such, mere allegations will not suffice; instead, a defendant must make concrete allegations of ineffective assistance, and substantiate them, or risk summary dismissal.[24] Deference must be given to defense counsel's judgment in order to promote stability in the process.[25]

To overcome the strong presumption that trial counsel provided competent representation, the defendant must demonstrate that "counsel failed to act

---

[19] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).
[20] *Premo v. Moore*, 562 U.S. 115, 122-23 (2011); *also see Flamer v. State*, 585 A.2d 736, 753-44 (Del. 1990) (citations omitted).
[21] *Premo,* 562 U.S. at 122.
[22] *Id.*
[23] *Id.* (citing *Strickland*, 466 U.S. at 690).
[24] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).
[25] *State v. Fithian,* 2016 WL 3131442 at * 3 (Del. Super. May 25, 2016) (citing *Premo*, 562 U.S. at 120-122).

reasonabl[y] considering all the circumstances" and that the alleged unreasonable performance prejudiced the defense.[26] The essential question is whether counsel made mistakes so crucial that they were not functioning at the level guaranteed by the Sixth Amendment, thereby depriving defendant of a fair trial.[27]

Because a defendant must prove both parts of an ineffectiveness claim, a court may dispose of a claim by first determining that the defendant cannot establish prejudice.[28] The first consideration in the "prejudice" analysis "requires more than a showing of theoretical possibility that the outcome was affected."[29] "It is not enough to 'show that the errors had some conceivable effect on the outcome of the proceeding.'"[30] Defendant must show a reasonable probability of a different result (i.e., acquittal) but for defense counsel's alleged errors.[31]

## A. <u>PROCEDURAL BARS</u>

In any motion for postconviction relief, this Court must first determine whether a defendant has satisfied the procedural requirements of Superior Court Criminal Rule ("Rule") 61 before considering the merits of the underlying claims.[32]

---

[26] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 688).
[27] *Id*.
[28] *Strickland,* 466 U.S. at 697.
[29] *Frey v. Fulcomer*, 974 F.2d 348, 358 (3rd Cir. 1992).
[30] *Harrington v. Richter*, 131 S.Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 693).
[31] *Strickland*, 466 U.S. at 695.
[32] *Taylor v. State*, 32 A.3d 374, 388 (Del. 2011) (quoting *Shelton v. State,* 744 A.2d 465, 474 (Del. 1999)).

Rule 61(i)(1) prohibits the Court from considering a motion for postconviction relief unless it is filed within one year after the judgment of conviction is final.[33]

Rule 61(i)(2) prohibits the filing of repetitive motions for postconviction relief, unless: under Rule 61(d)(2)(i), the movant "pleads with particularity that new evidence exists that creates a strong inference" of actual innocence; or, under Rule 61(d)(2)(ii),"that a new rule of constitutional law, made retroactive to cases on collateral review," applies to the movant's case.[34]

Rule 61(i)(3) provides that "any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this Court, is thereafter barred, unless the movant shows (a) cause for relief from the procedural default and (b) prejudice from the violation of movant's rights."[35]

Rule 61(i)(4) provides that "[a]ny ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an

---

[33] Super. Ct. Crim. R. 61(i)(1). A judgment of conviction is final "when the Supreme Court issues a mandate or order finally determining the case on direct review." *State v. Drake*, 2008 WL 5264880, at *1 (Del. Super. Dec. 15, 2008). Rule 61(i)(1) also affords a Defendant an opportunity to present a motion which "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court." *Id.* Because Defendant has not claimed a newly recognized retroactively applicable right applies to this postconviction motion, the exception is inapplicable.
[34] Super. Ct. Crim. R. 61(i)(2).
[35] Super. Ct. Crim. R. 61(i)(3).

appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred."[36]

Rule 61(i)(5) provides that the procedural bars provided in Rules 61(i)(1)-(4) do not apply to a claim that the Court lacked jurisdiction or if the Defendant satisfies the pleading requirements of Rule 61(d)(2)(i) or (d)(2)(ii).[37]

Typically, as to the timeliness of the filing of a postconviction motion, this Court considers whether a Defendant timely filed a postconviction motion within one year after the judgment of conviction became final.[38] Here, Defendant's Motion was filed on July 22, 2024,[39] *before* the Delaware Supreme Court issued its Mandate.[40] Pursuant to Rule 61(a)(4), a postconviction motion "may not be filed until the judgment of conviction is final," and where a defendant appeals their conviction, a judgment of conviction is not final until the Delaware Supreme Court issues its Mandate. This procedural requirement is *in addition to* the timing requirement set forth in Rule 61(i)(1), which requires that a motion for postconviction relief be received within "one year after the judgment of conviction is final."[41] Because the judgment of conviction was not final when Defendant filed the motion for postconviction relief, he cannot satisfy the procedural bar set forth in

---

[36] Super. Ct. Crim. R. 61(i)(4).
[37] Super. Ct. Crim. R. 61(i)(5).
[38] *See* Rule 61(a)(4).
[39] D.I. 44.
[40] D.I. 49. The Delaware Supreme Court issued its Mandate on September 30, 2024.
[41] See Rule 61(i)(1).

Rule 61(i)(1). Therefore, Defendant's Motion is procedurally defaulted pursuant to both Rule 61(a)(4) and Rule 61(i)(1).

Second, Rule 61(i)(2) is a procedural bar to successive postconviction filings. As this is Defendant's first postconviction motion, Rule 61(i)(2) is inapplicable.

Third, Rule 61(i)(3) requires a litigant to assert postconviction claims in the proceedings leading to the judgment of conviction. Here, Defendant's claims are convoluted in light of the claims raised in the direct appeal, so identifying analogous claims raised below and in postconviction is challenging. That being said, Defendant did not raise, before or during the trial, or on direct appeal, the following claims: the prosecutor suppressed evidence of blood and physical injuries he suffered by not including the steering wheel locking device in discovery;[42] the victim's statements were improperly removed from evidence;[43] he was denied the right to subpoena expert collision and medical experts;[44] and a claim that his waiver

---

[42] *See* D.I. 44, Ground one, p. 3.

[43] *Id.*, p. 4. On direct appeal, Defendant claimed a "crucial" piece of evidence was removed from the exhibits which were to be presented to the jury. The Delaware Supreme Court identified those as "a flash drive and disk that had been marked for identification as defense exhibits 9 and 10." *See Norman*, 2024 WL 4165103, at *6. The trial transcript suggested that the flash drive and disk "contained (i) photos or other information that was duplicative of exhibits that were in evidence and (ii) a video that was not admitted into evidence." *Id.* It is at best unclear if the video includes the victim's statements. If these are exhibits which include a victim statement, then this claim is procedurally barred pursuant to Rule 61(i)(3). If not, it is procedurally barred pursuant to Rule 61(i)(4) as formerly adjudicated.

[44] *See* D.I. 44, Ground two, p. 3. To the extent Defendant's claim can be interpreted as an ineffective assistance of counsel claim, that claim is not procedurally barred, because a Defendant does not generally have an opportunity to assert ineffective assistance of counsel claims on direct appeal. However, to the extent Defendant failed to manage his defense and enlist expert witnesses

of the right to counsel was "uninformed," i.e., that this resulted in a denial of an assumed right to substitute appointment of counsel.[45] Excepting any arguable ineffective assistance of counsel claims, Defendant has failed to explain why he failed to timely raise these claims before or during trial, or on direct appeal, and he has not pled specific prejudice from the failure to do so.[46]

Pursuant to Rule 61(i)(4), a litigant cannot re-litigate a claim that has been formerly adjudicated. Here, there are two claims which the Delaware Supreme Court considered and rejected on direct appeal: (a) this Court erred by allowing Defendant to represent himself at trial;[47] and (b) a "crucial piece of evidence," which was marked for identification, was removed from the exhibits that were to be provided to the jury during deliberations.[48] To the extent Defendant's postconviction claims track the claims raised on direct appeal, these claims are procedurally barred because they were formerly adjudicated.

Finally, the Defendant could have avoided the applicability of the procedural bars in Rule 61(i)(1)-(4) if he presented valid claims (1) asserting that the Court lacked jurisdiction, or (2) he pled with particularity that (a) new evidence exists that creates a strong inference that Defendant is innocent in fact of the charged offenses,

---

after he was authorized to represent himself, his failure to manage his defense and call expert witnesses is subject to Rule 61(i)(3)'s procedural bar.

[45] *Id.*, p. 3-4.
[46] *See* Super. Ct. Crim. R. 61(i)(3)(A) and Super. Ct. Crim. R. 61(i)(3)(B).
[47] *See Norman*, 2024 WL 4165103, at *4.
[48] *Id.*, at *6.

or that (b) a new rule of constitutional law made retroactive on cases on collateral review by the United States Supreme Court or the Delaware Supreme Court applies to his case and makes his conviction invalid.[49]  Defendant has not argued the applicability of Rule 61(i)(5) and Rule 61(d)(2) to avoid the procedural bars noted *supra.*  Therefore, his motion is procedurally barred pursuant to Rule 61(a)(4) and Rule 61(i)(1), and his claims are barred pursuant to Rule 61(i)(3) and Rule 61(i)(4). The postconviction motion was untimely filed and claims that were not raised before or at trial, or on direct appeal, are procedurally barred.  Further, any claims that were previously adjudicated are procedurally barred.  I therefore recommend Defendant's claims be summarily dismissed.

Despite the application of the procedural bars to Defendant's Motion, I will consider and decide Defendant's claims on the merits.  As will be discussed *infra*, Defendant's claims are meritless and fail to establish prejudice under *Strickland's* exacting standards.

## B. <u>DISCUSSION</u>

### a.  Ground One: Suppression of Favorable Evidence

Defendant first contends that the prosecution suppressed favorable evidence of blood and physical injuries "inflicted to the defendant by not including the alleged

---

[49]  *See* Super. Ct. Crim. R 61(d)(2).

weapon in discovery."[50] Defendant's claim is unsupported by the record. There is no record evidence that the State had possession of or otherwise recovered the Club-style steering-wheel locking device (hereinafter the "Club") during its March 20, 2022 investigation or at any time thereafter. Therefore, the State could not catalog the Club as evidence, produce it in discovery, or admit it as evidence at trial.

On the first day of trial, Dennis Zink ("Zink") described how Defendant (a) aggressively pursued and repeatedly struck him and (b) damaged his vehicle with the Club. State's witnesses Michele Behornar, John Coverdale, Raymond Zelano and Shawanda Jackson all corroborated Zink's testimony, as each of them saw Defendant aggressively pursue, threaten and attack Zink (and/or Zink's vehicle) with the Club.[51]

At some point during the incident, Shawanda Jackson's brother, Jamal Jackson, heard the ruckus, exited his home, and recognized the Defendant as a person he knew from his high school football team.[52] Jamal also saw the Defendant yelling in front of a Zink's truck and brandishing the Club.[53] Eventually, Defendant and Jamal left the scene, as Jamal drove Defendant to the area of the Governor's

---

[50] D.I. 44, Ground one, p. 3.
[51] *See* Testimony of Michele Behornar, D.I. 38, at 221:21 – 223:9; Testimony of John Coverdale D.I. 38, at 232:22 – 234:11; Testimony of Raymond Zelano D.I. 38, at 243:3 – 245:20; and Testimony of Shawanda Jackson D.I. 39, at 6:2 – 21.
[52] D.I. 39; Trial Tr. 19:1 – 3.
[53] *Id.* at 20:4 – 13.

Square Shopping Center ("shopping center").[54]   When the Defendant got out of Jamal's car near the shopping center, he was still in possession of the Club, and he walked off with it in the direction of the shopping center.[55]   Jamal then returned home.   A short time later, when Defendant was apprehended by DSP near the shopping center, he did not have the Club in his possession,[56] and DSP looked for it but failed to find it.[57]   In short, the Club was in Defendant's possession when he exited Jamal's car, but Defendant did not have it with him when DSP arrested him. Therefore, the Club was never in the possession of the State, nor was it "suppressed" by the prosecutor,[58] as the Defendant was the last person seen with the Club. Additionally, the Defendant did not object to the admission of the image of the Club into evidence during the trial, and he did not object when several witnesses identified the image as being consistent with the object Defendant used to bludgeon Dennis Zink and Zink's vehicle.[59]

Under these circumstances, Defendant's claim that defense counsel led him to believe the weapon would automatically be included as evidence is misleading,

---

[54]  *Id.* at 22: 7 – 23:12.
[55]  *Id.* at 23:13 – 15, *see also* 64:7 – 18.
[56]  *Id.* at 64:19 – 22.
[57]  *Id.* at 64:23 – 65:3.
[58] Defendant admitted he possessed the Club "at the scene where he was apprehended not at the collision.  It was at the scene where [he] was arrested." *Id.* at 128:10 – 11.   Defendant discarded the Club before his arrest and now claims he is not sure why the State does not have it in evidence. *Id.* at 129: 1 – 3.
[59]  *See* State's Ex. 17, *also see* D.I. 38, at 118:5 – 11.

because he knew he was the last person with the Club, and knew, at his apprehension, the Club was not recovered by the State. Defendant's claims are meritless, unsupported by any record evidence, and he cannot demonstrate prejudice.

As to Defendant's final argument in Ground one, he asserts "initial victim statements were removed from evidence which highlighted gross deviations in the victim's initial account of events and his testimony at trial." This claim is meritless. First, the items purportedly removed from evidence were marked for identification only – they were not "evidence." Second, Defendant has not identified the statements he is referring to, or the content of the statements at issue, and he has failed to substantiate this claim with any specific facts. Defendant has not explained, to any degree, how Dennis Zink's recorded statement (if there is one) constituted a gross deviation from Zink's sworn trial testimony. The record does not reflect any out of court statement by the victim was entered into evidence, which is why the proposed exhibits would have been marked for identification. Defendant cannot demonstrate prejudice from the omission of non-evidence as a trial exhibit, and his claim fails.

It is also important to remember that at the time the purported identification evidence was removed, Defendant was acting as his own lawyer, and he bore sole responsibility for the admissibility of evidence. The record does not reflect Defendant objected to the removal of the proposed exhibits marked for identification

16

only.[60]  And, the Defendant has not explained how the removal of the alleged victim's statement was prejudicial.

Assuming, for argument's sake, that Defendant is referring to Defense Exhibits 9 and 10, defense counsel explained that Defendant "had not fully shared the contents of a flash drive and disc with the State before the State agreed to those items being admitted into evidence." And it turned out the items at issue contained "duplicative videos that were already admitted as State's evidence, and they contained an MVR video which would have been relevant only for impeachment purposes but otherwise contained hearsay statements."[61]  None of the alleged deficiencies asserted in Claim one create a reasonable probability that the outcome of the trial would have been different but for defense counsel's decision to correct the record and only allow admitted evidence to accompany the jury during its deliberations.  For each of the arguments Defendant raises in Claim one, he has failed to establish prejudice under *Strickland*.

### b. Ground Two: Denial of Right to Subpoena Witnesses

Defendant next argues he was denied the right to subpoena expert witnesses, specifically, "collision and medical experts."  He claims to have asked defense

---

[60] *See* D.I. 39, p. 3-4.  The Delaware Supreme Court rejected Defendant's claim on direct appeal, concluding, after a review of the record, "that the items were correctly removed from the materials that were available to the jury during deliberations."  *Norman*, 2024 WL 4165103, at *6.
[61] D.I. 53, ¶ 3-4; *see also* D.I. 39, 3:10 – 4:23.

counsel to do so on several occasions, and she refused. In response, defense counsel denies Defendant's claims. Defense counsel, then acting as trial counsel of record, met with Defendant on at least nine occasions, discussed Defendant's self-defense strategy, particularly with respect to which party caused the accident and who was the aggressor thereafter, and identified challenges and shortcomings to asserting self-defense, or justification, arguments.[62]

As to Defendant's claim that defense counsel should have enlisted a medical expert to "discuss his state of mind," Defendant was in fact evaluated by a psychologist who, after completing an examination, could not support a viable mental illness defense.[63] And, defense counsel also contacted Defendant's endocrinologist, who also "declined to provide counsel with any opinion on [Defendant's] state of mind during the time of the alleged offense."[64]

Defendant's claims are not supported by the record, and the record reflects defense counsel acted reasonably. Defense counsel critically examined both of Defendant's requests and did not believe an expert collision witness or mental health witness would have been helpful to a viable defense. Further, Defendant's request for a self-defense jury instruction was denied by this Court, and the Delaware Supreme Court affirmed this Court's decision to deny Defendant same:

---

[62] *Id.*, defense counsel's Affidavit, ¶ 6(a)-(l).
[63] *Id.*, ¶ 7.
[64] *Id.*

The Superior Court correctly concluded that the evidence did not satisfy [the self-defense] standard in this case. Taking Norman's version of events as true, Norman could not reasonably have believed that beating Zink with the steering-wheel lock was immediately necessary to protect himself against a use of unlawful force by Zink. Even if, as Norman testified, Zink caused a collision that otherwise would have been avoided, Norman did not show that Zink continued to pose any threat after the crash. To the contrary, Norman admitted the following: Zink stayed in his truck after the crash and did not approach Norman's vehicle; Norman could have left the area or waited for police to arrive but instead got out of his vehicle and approached Zink's truck with the steering-wheel lock in hand; Zink remained seated in his truck and closed the window when Norman confronted him; Norman smashed Zink's window with the steering-wheel lock, leaned into Zink's truck, and tried to remove Zink from the truck; and Norman threatened to murder Zink while striking him with the steering-wheel lock. The Superior Court did not err by denying Norman's request for a self-defense instruction.[65]

Defendant has failed to demonstrate trial counsel's representation was unreasonable, or that he was prejudiced because of same. Pursuant to her affidavit, with respect to hiring an accident reconstruction expert, defense counsel met with Defendant on at least nine occasions, discussed Defendant's self-defense strategy, particularly with respect to which party caused the accident and who was the aggressor thereafter, and identified challenges and pitfalls to same.[66] None of Defendant's indicted charges required the State to prove who caused the motor vehicle collision. It was Defendant's actions *after the collision* that were charged by the State and scrutinized by the jury in its deliberations. And, as to Defendant's

---

[65] *Norman*, 2024 WL 4165103, at *3.
[66] D.I. 53, Affidavit of defense counsel, ¶ 6(a)-(l).

19

claim that defense counsel should have enlisted an expert to "discuss his state of mind," defense counsel had Defendant evaluated by a psychologist and spoke to his endocrinologist. Neither could offer an expert opinion which would have mitigated Defendant's behavior post-accident.

In short, Defense counsel's representation fell well withing the wide range of reasonable professional assistance, and Defendant has failed to substantiate his claims. He has failed to submit a collision expert report or a medical expert report which would have mitigated his actions on March 20, 2022.[67]

Defense counsel acted reasonably and diligently in meeting with Defendant on multiple occasions, considered his arguments and position, and ultimately elected to not pursue alternative expert testimony. Defendant has failed to demonstrate prejudice, or that the result of the trial would have been different, but for defense counsel's decision not to obtain or present collision or mental health experts.

### c. Claim Three: Uninformed Waiver to the Right of Counsel

---

[67] In his response to defense counsel's affidavit, Defendant rejected any argument that he was acting in self-defense – he now asserts he is entitled to assert a generalized "justification" defense. Specifically, Defendant wrote in his response to defense counsel's Affidavit: "I never expressed I felt fearful of an immediate threat or acted in self-defense. Instead, I expressed to Ms. Phillips I felt justified in my actions to constitute the charges against me." D.I. 57, p. 2-3. Delaware law does not include a general, subjective justification defense, and Defendant has not identified an applicable statutory justification defense. *See generally* 11 *Del. C.* § 462-471 (Delaware's statutory justification defenses). Defense counsel's decision to limit consideration of potential defenses to self-defense was reasonable, even though this Court declined to instruct the jury on self-defense.

In Claim three, Defendant argues his waiver of counsel was "uninformed," because he now believes he "could have simply asked the Court for a different public defender or asked the Court to retain a private attorney on [his] behalf."[68] He further suggests that a newly appointed attorney would have agreed to subpoena expert collision and medical professionals on his behalf, and they would have favorably "opine[d] on the physical evidence surrounding a collision and on the causation of damage as well as the effects such a sudden encounter had on [his] actions and state of mind to constitute the charges."[69]

Defense counsel denies Defendant's claim. She met with Defendant on June 20, 2023, July 7, 2023 and August 30, 2023, and during those meetings she attempted to dissuade him from claiming self-defense.[70] Defense counsel was also aware that in this Court, a defendant could not "personally select [a] public defender," there was "no need for conflict counsel to be appointed," and the Court does not "retain private counsel for defendants."[71]

Additionally, to the extent Claim Three could be interpreted to suggest Defendant is arguing his waiver of counsel was not made knowingly, defense counsel recounted a telephone call with Defendant on September 1, 2023, where she

---

[68] D.I. 44, p. 3-4.
[69] *Id.*
[70] D.I. 53, ¶ 8.
[71] *Id.*

informed him he was responsible for "entering evidence, cross-examination, opening statements, closing arguments, proposing *voir dire* questions, and proposing jury instructions."[72] Defendant acknowledged that "he understood his trial responsibilities and that he wished to proceed *pro se*."[73] She then alerted this Court that Defendant intended to represent himself with defense counsel in a standby counsel role, and on September 7, 2023, this Court conducted a colloquy with Defendant and concluded the waiver of his right to counsel was "knowing, intelligent and voluntary."[74]

Defendant now expresses post-trial regret that he might not have waived his right to counsel if he knew he could have requested substitute counsel, but post-trial regret does not amount to *Strickland* prejudice. First, there is no authority for Defendant's assertion that this Court would have appointed him a substitute public defender, conflict counsel, or a member of the private bar to represent him in his criminal case, so the premise of his regret is unfounded and meritless. Second, Defendant cannot assume substitute counsel would have agreed with Defendant's subjective intention to call a collision or mental health expert – a Delaware lawyer has an obligation to this Court to exercise their independent judgment, despite what their client may desire. Finally, Defendant has failed to substantiate his assertion

---

[72] *Id.*, ¶ 9.
[73] *Id.*
[74] *Id.*; *See also* D.I. 40, 8:10-15.

with an expert report that a collision expert or mental health expert would contribute to a specific justification defense. Defendant is required to substantiate this claim, and he has not done so here.[75] Defendant's claim is meritless, and he cannot demonstrate prejudice (*i.e.*, that the result of the proceeding would have been different but for the conduct of defense counsel).[76]

## IV.   CONCLUSION

Defendant has failed to demonstrate he was prejudiced as a result of any of the alleged errors pled in this Motion. He has failed to demonstrate that the outcome of the trial was adversely affected by any of the alleged errors he complains of, and he has not shown a reasonable probability that he would have been acquitted but for defense counsel's alleged errors. I therefore recommend Defendant's Motion for Postconviction Relief be **SUMMARILY DISMISSED.**

**IT IS SO RECOMMENDED.**

/s/ Martin B. O'Connor
Commissioner

oc:   Prothonotary

---

[75] *See Younger*, 580 A.2d at 556.

[76] To the extent Defendant's waiver of the right to counsel is interpreted as a claim that his waiver was not knowingly entered, the record does not support this claim. *See* D.I. 40, 8:10-15; *see also Norman*, 2024 WL 4165103, at *5 ("The record in this case reflects that the Superior Court undertook an appropriate inquiry and determined that Norman's decision to waive his right to counsel was knowingly, intelligently and voluntarily made.")